## Woodring, Executor, v. Woodring

*Fleming & Litke,* for petitioner.

*Arthur C. Dale,* for respondent.

WALKER, P. J., December 4, 1939.—This is a proceeding instituted by the executor under the last will and testament of Caroline Cogan Woodring in the nature of a declaratory judgment for the purpose of having the court interpret said will in the light of the language used therein.

Caroline Cogan Woodring died September 11, 1938, having first made and published her last will and testament wherein she provided, inter alia, as follows:

"I do further direct, and it is my will that my executor hereinafter named, or the executor subsequently appointed by me, shall pay or cause to be paid, out of the assets of my estate, all of my just debts, funeral expenses, taxes, if any, and costs incident to the probating of this, my last will and testament, and those incurred in the proper and prompt settlement of my estate, as soon after my death as may be convenient."

It will be noticed that in this portion of the will she provided for a "proper and prompt settlement" of her estate. Item 1 provided:

"I give, devise and bequeath my personal effects as directed in the supplementary paper accompanying this last will and testament, which statement is witnessed separately from this paper."

A reading of the supplemental paper attached to the will discloses that it indicated the method of distribution of the furniture and household goods which she owned among her children, and those given to her son, Russell, are as follows:

"Dining chairs, rug in dining room; side board; white iron bed; mattress; a pair of pillows; four (4) good sheets; four (4) good pair pillow cases; high back new rust rocker; kitchen table; bow tie quilt; two (2) Indian blankets that he bought; three (3) Army blankets that belong to him; bed comfort; light blue comfort; six (½ doz.) silver knives with the odd forks; two tablecloths; four (4) good table spoons; Walnut dresser. If he and Nan want to exchange the dresser and chiffonier, All right; Russell's own bath towels; Any dishes he needs that is in the cupboard; kitchen cupboard and kitchen range."

From a reading of the long list of items which she distributed among her various children it is quite evident that only a small portion of the furniture which was

located in the house owned and occupied by her was given to her son, Russell Woodring, and that it would be only sufficient to furnish a combined kitchen and dining room and bedroom for him personally. Item 2 provided:

"I further direct that my real estate consisting of a property in Port Matilda, Pennsylvania, be sold after my death and that the proceeds derived from such sale be divided equally among my surviving children, as follows: Mary W. Hoover, Nancy W. Pugh, Howard B. Woodring, Mildred W. Confer, Iva W. Lykens, George Merle Woodring, Joseph Russell Woodring, or equally among as many of the foregoing as may survive at the time of my decease.

"In connection with this distribution, I do further direct that in effecting sale of this property, my son Russell Woodring, if he be an occupant of this home at my death, be not permitted to suffer undue inconvenience by such summary or speedy action as would entail distress to his existence. In this will I instruct my executor to guard against and prevent such inconvenience, indefinitely, in carrying out these provisions of sale."

It will be noticed that in this item the executor was directed to sell the real estate after the death of decedent for the purpose of distributing the money among the heirs mentioned therein. The only restriction placed upon the sale was in the following language:

"In connection with this distribution, I do further direct that in effecting sale of this property, my son Russell Woodring, if he be an occupant of this home at my death, be not permitted to suffer undue inconvenience by such summary or speedy action as would entail distress to his existence. In this will I instruct my executor to guard against and prevent such inconvenience, indefinitely, in carrying out these provisions of sale."

There cannot be any question but that the executor was to make the sale, but in effecting the sale Russell Woodring was not to be permitted to suffer undue inconvenience by such summary or speedy action and the executor was to guard, indefinitely, against any such summary or

speedy action as would permit Russell Woodring to suffer undue inconvenience.

It is contended by Joseph Russell Woodring that this language is such as would vest a life interest in this property. To place this interpretation upon this language would create an inconsistency in the language used in the will, when testatrix provided that the real estate was to be sold after her death and the proceeds derived from such sale to be divided equally among the surviving children, which included Joseph Russell Woodring. If the sale was not to take place until after the death of Joseph Russell Woodring, it puts a strained meaning upon that portion of the will which directs that he shall participate in the distribution of the proceeds, if he survived the mother.

In the case of Reynolds et al. v. Crispen et al. (Pa. 1887), 8 Sadler 252, 11 Atl. 236, the testator after devising land to his three daughters in fee proceeded as follows:

" 'At the decease of any of my daughters, their portion of the mansion farm is to belong to the surviving sisters or sister during their lives or life. If . . . any of my children should become destitute of house or home, they are to have the privilege of making the mansion house and farm their home and residence with those there upon good behavior. It is intended by me as a home or asylum for my wife, sons, and daughters, and not to belong or go into the possession of any other person or persons whilst any of them live, and necessity require it, without the consent of those living.' "

The court held that he did not intend to limit the estate or interest of his daughters in the land devised to them in fee, but to restrain them from alienating the place while any of his children might by necessity become homeless, and that it did not prevent the survivor of the three daughters from disposing of her interest in the farm, by will or otherwise.

In the case of Brennan's Estate, 324 Pa. 410, 413, the court said:

"In attempting to reconcile the apparently conflicting provisions of this will, our primary aim must be to ascertain and give full effect to the intention of testator as it appears from the four corners of the will. 'In construing wills the courts are always searching for the testator's true intent' ". The court further said, on page 416: " 'It is a well understood rule of construction that effect must be given, if possible, to every part of the will and to all the words used by testatrix' ".

It is quite evident by the language of the will that testatrix contemplated a sale of this real estate in the lifetime of Joseph Russell Woodring for the purpose of making a distribution to and among all her children. Even in the restricting clause testatrix provided "In connection with this distribution." No distribution could be made unless a sale was effected. It is, therefore, necessary to attempt to arrive at the intent of testatrix and such meaning should be given to the language used by testatrix which might be consistent with the accomplishment of the end which she sought, namely, that the real estate be sold for the purpose of distribution.

What did testatrix mean when she said that "if he [Joseph Russell Woodring] be an occupant of this home at my death, be not permitted to suffer undue inconvenience by such summary or speedy action as would entail distress to his existence"?

The word "inconvenience" has been defined by Webster's International Dictionary as follows: "Quality or condition of being inconvenient . . . incongruity; unsuitableness; impropriety. . . . Harm; mischief; misfortune . . . That which is inconvenient . . . that which gives trouble, embarrassment, or uneasiness; a disadvantage; anything that disturbs quiet, impedes prosperity, or increases the difficulty of action or success; a discomfort."

The word "undue" by the same dictionary has been defined as follows: "Not agreeable to a rule or standard, or to duty; excessive; immoderate; inordinate; as an

*undue* attachment to forms; an *undue* rigor in the execution of law."

The use of the word "undue" has a limiting effect upon the meaning of the word "inconvenience". Anything that a person might be compelled to do might be an inconvenience, but by the use of the word "undue" there is such a modification of the meaning as would indicate that testatrix by its use had in mind an inconvenience that would be more than an ordinary one. This combination of words is quite similar to that expression of "undue influence", against which there is a prohibition so far as the making of a will is concerned. A will could be valid even though testator might have had some influence exerted upon him, but as soon as it amounts to "undue influence", it changes the picture entirely. Being compelled to move from the property and seek another home would not of itself, in the ordinary acceptance of the words, amount to "undue inconvenience by such summary or speedy action as would entail distress to his existence." It might create an inconvenience, but it would not amount to an "undue inconvenience". These words contemplate something more than the mere necessity of moving from one place to another. His physical condition might be such that to be compelled to move would create distress to his existence. There is nothing, however, in the testimony in this case to indicate that he was not active physically. The testimony discloses that he was employed actively on a W. P. A. job, that he was justice of the peace, that he was unmarried, and naturally boarded himself, so that the only possible inconvenience that might be incurred by him would be that he would have to seek another home. This, in the opinion of the court, would not amount to an "undue inconvenience" such as would entail distress to his existence, nor is there evidence that a sale at this time would be such a summary or speedy action as would have a similar effect, as more than a year has elapsed since the death of decedent.

Testatrix further provided: "In this will I instruct my executor to guard against and prevent such inconvenience, indefinitely, in carrying out these provisions of sale." Here again the idea of sale is very evident, and the word "inconvenience" is preceded by "such," indicating that it refers back to the prior sentence and the type of inconvenience which was therein set forth, namely, "undue inconvenience".

What did testatrix mean, however, by the word "indefinitely"? It has been defined in Webster's International Dictionary as "In an indefinite manner; not precisely or clearly; vaguely; as, to promise *indefinitely.*

"To an indefinite extent or degree; without known or prescribed limits; as, to continue *indefinitely.*" Did not testatrix intend by the use of this word to indicate a meaning opposite to "definitely", or in other words, "not definite"? Did she not intend by the use of the word that she did not want to fix a definite time, because circumstances might be such that at the end of the period fixed by her the very condition of "undue inconvenience" might exist against which she was attempting to guard? But by failing to fix a definite time, then the executor could select such a time when "undue inconvenience as would entail distress to the existence" of Joseph Russell Woodring would not exist.

Testatrix, if it had been her intent, could have stated that Joseph Russell Woodring, her son, could have had the use and occupancy of this property during his natural life, which would have been for a definite and fixed time. However, the court is of the opinion that it was her desire to have this property sold and a distribution made. This is evidenced by the language of the will itself, and it is further evidenced by the supplemental paper distributing the furniture contained in said home. If it was her desire to provide this as a home for her son, Joseph Russell Woodring, during his natural life, then no doubt she would have provided that he should have the use and bene-

fit of all the furniture for a similar period. It is not likely that she contemplated the occupation of this house by him for a period of time, such as his natural life, and only gave him so much of the furniture as at the best would furnish a kitchen and a bedroom. That she contemplated a sale is evidenced by the fact that she said that if he was occupying the home at her death that he should not be permitted to suffer undue inconvenience by "such summary or speedy action". This certainly indicated a desire on her part that he should be given a reasonable opportunity to remove therefrom, consistent with "undue inconvenience as would entail distress to his existence." The will further provided:

"In connection with the sale of the real estate already described, I further direct that the opportunity to buy outright this property be accorded to any such of my children who in the judgment of the executor and, I hope of the survivors also, who may offer proper terms to the advantage of the beneficiaries and that such purchaser have preference over any outside buyer."

This provision further indicates that the primary desire of testatrix was to have the real estate sold and an opportunity be given, according to testatrix, by the executor to all the heirs, including Joseph Russell Woodring, to purchase the said property, and it was only because of the failure of all of them to take advantage of this provision that a petition has been presented asking permission to sell the real estate.

A petition has been presented requesting permission be given the executor to sell the real estate at this time. The court is of the opinion that the executor should be permitted, under the language of the will, at this time to sell the said real estate, and the following order is hereby entered.

## Decree

And now, to wit, December 4, 1939, it is hereby directed that the executor of the last will and testament of Caroline Cogan Woodring, late of Port Matilda Borough, de-

ceased, is hereby directed to sell the real estate of said decedent located in the Borough of Port Matilda, described in this proceeding, at public sale.